In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1866

UNITED STATES *ex rel.* DEBRA MARSHALL, *et al.*,

*Plaintiffs-Appellants,*

*v.*

WOODWARD, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:06-CV-01746 — **Gary S. Feinerman**, *Judge.*

ARGUED OCTOBER 29, 2015 — DECIDED DECEMBER 11, 2015

Before FLAUM, MANION, and ROVNER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Plaintiffs Debra Marshall and Peggy Thurman bring this *qui tam* action against Woodward, Inc. under the False Claims Act ("FCA"). Plaintiffs allege that Woodward falsely certified helicopter engine parts that it sold to the government. They also claim that Woodward violated the FCA and Illinois state law by terminating their employment. In the district court, Woodward moved for sum-

mary judgment. The court granted the motion, holding that even if Woodward made false statements to the government, no reasonable jury could find that Woodward did so knowingly and that the statements were material. The district court also rejected plaintiffs' retaliation claims. Marshall and Thurman appeal and for the reasons that follow, we affirm.

## I. Background

Woodward is a government contractor that manufactures parts used in military aircrafts. One of these parts, the "T700 HMU," regulates fuel flow for engines in Blackhawk and Apache helicopters. Woodward sells the T700 HMU to General Electric ("GE") for incorporation into helicopter engines. It also sells the part directly to the U.S. Department of Defense ("DOD") for spare and replacement parts.

One of the components of the T700 HMU is the "T2 sensor," which helps regulate fuel flow by measuring changes in air temperature. A picture of the T2 sensor is included below:



The sensor has a coil end and a bellows end connected by a capillary tube. The coil end measures changes in air temperature. Any change in temperature causes alcohol contained in the capillary tube to expand or contract, which in turn triggers movement in the bellows end and controls fuel flow

to the engine. Crucially, the functionality of the sensor depends on the amount of alcohol in the capillary tube; if any alcohol leaks, the sensor will add more fuel than it should. A defective sensor can cause the engine to smoke, decrease thrust, lose horsepower, or burn up.

The T2 sensor has a total of eight "sealing joints" that connect the various parts of the component and contain the alcohol. Joints are sealed by "brazing," a process that joins two metal surfaces by melting a filler metal. Woodward classifies its joints by category, such as Grade A, Grade B, and so forth. These classifications help determine what procedures are used to braze the joint and how the joint is inspected for imperfections. One of the T2 sensor's sealing joints, the joint that connects the capillary tube to the sensor head at the bellows end, is designated as a Grade A joint (hereinafter "the Grade A joint"). Plaintiffs allege that Woodward failed to properly braze and inspect the Grade A joint.

Woodward, like every military supplier, must follow a set of comprehensive quality requirements. Woodward develops these requirements and certifies compliance with them when delivering parts and requesting payments. The procedure for brazing and inspecting joints is generally governed by Woodward's Shop Procedure 865 ("SP-865"). Woodward can revise provisions of SP-865 without notifying or obtaining consent from GE or the DOD. Further requirements for the Grade A joint are set forth in engineering drawings and process drawings. The parties disagree about the specific requirements for the Grade A joint, including: (1) the appropriate diametrical clearance (i.e., the distance between the capillary tube and the sensor head); (2) how "stop-off" and "flux" (materials used during the brazing process)

are removed and detected; and (3) whether the joint's non-visible edge must be inspected by an alternative to visual examination, such as by X-ray.

Whenever Woodward ships parts to GE or the DOD, it must include a "Certificate of Conformance," in which it confirms that all shipments are "in the Quantities and Quality called for, and were in all respects in accord with the applicable specifications." The district court assumed, and the parties do not dispute on appeal, that Woodward certifies that it has followed its quality requirements in manufacturing each part by including these certificates. Neither GE nor the DOD accepts shipments without a certificate.

Prior to their termination in 2005, plaintiffs Marshall and Thurman were long-time employees of Woodward. They received all of their training at Woodward. Neither has a college or technical degree. Both Marshall and Thurman worked on the T2 sensor at Woodward. They were tasked with brazing various joints on the sensor, but not the Grade A joint.

On April 6, 2005, Marshall attended a meeting with T700 engineer Heather Diedrich, senior X-ray technician Mark Frutig, and two other engineers. Diedrich noted an increased incidence of leakage in the T2 sensor. Marshall volunteered to investigate the problem and asked Frutig to X-ray the Grade A joint. Based on Frutig's findings and her own inspection, Marshall determined that the diametrical clearance of the joint was too small, that stop-off and flux were not removed, that there was insufficient braze in the joint, and that braze from another joint was "masking" the problems with the Grade A joint. Marshall also learned from Frutig that the Grade A joint was not typically inspected by X-ray.

She concluded that the joint did not meet Woodward's quality standards and that the part was unsafe.

That same day, Marshall relayed her conclusions to her direct supervisor, Mark Meichtry, and Meichtry's supervisor, Steven Gorman. In a series of emails, Marshall stated that she would not perform her assigned tasks on the T2 sensor until her concerns were properly addressed. Thurman was included on some of these emails. On April 7, Meichtry responded with an email to Marshall and Thurman saying, "[l]et's keep this job moving." Marshall continued to inspect leaking parts and reiterated her earlier findings. Frutig also sent an email expressing the same concerns as Marshall. On April 11, Marshall placed a hold on the production of T700 parts.

Diedrich and senior engineer David Kuchinski investigated Marshall's concerns. On April 12, Meichtry informed plaintiffs that "[t]he hold issue has been discussed with the engineers and engineering leaders and the consensus was the parts are good to ship." Still, Marshall and Thurman refused to resume work on the sensor. In response, Meichtry sent an email to plaintiffs stating that "(1) it's going to take too much time and cost too much money to fix these problems, (2) GE wants the parts regardless of the problems and (3) it's the two of you against the world." In addition, manufacturing engineer Doug Hollenberger commented to plaintiffs that at Woodward, quantity is number one and quality is number two. Marshall persisted. She informed Meichtry that she was going to disclose her concerns to the DOD. On April 13, Meichtry suspended Marshall and sent Thurman home early the next day.

Later on April 14, Meichtry called Marshall and Thurman into Woodward for a meeting with Diedrich, Gorman, human resources manager Carol Smith, and quality director Spitaman Tata. Gorman reiterated that the engineers had concluded that the parts were "okay." According to plaintiffs, Gorman claimed that the sensors "leak slowly." Marshall persisted in her objection. She maintained that another joint masked the problems with the Grade A joint. She asked that Woodward study the problems further. Tata agreed to provide more X-rays of the joint but the parties were otherwise unable to reach an agreement on how to proceed.

At 10:30 that night, Marshall and Thurman returned to Woodward, gathered scrap T2 sensor parts, and cut two of them open. Marshall claims she identified masking in these parts.

On April 18, Meichtry and Diedrich provided plaintiffs with sixteen X-ray images of the joint. Only two of the images were discernable. Although the discernable X-rays showed evidence of masking, Diedrich and another engineer concluded that it was not problematic. Plaintiffs continued to refuse to work on the T2 sensor. At that point, Meichtry asked Marshall and Thurman to leave Woodward. The parties dispute whether they were fired or merely suspended.

The next day, Marshall called a Woodward hotline for reporting suspected violations of Woodward's quality policies. Marshall left a message echoing her belief that there was "a safety issue on the T700 sensor." She claimed that the sensor "does not meet the SP on the bellow end of the part … ." In response to Marshall's message, Woodward's General Counsel Robert Reuterfors referred the matter to Woodward's Business Conduct Oversight Committee ("BCOC"). Reuter-

fors told plaintiffs that they were on administrative leave with pay pending the BCOC's investigation.

Reuterfors asked senior engineer Ted Erickson to conduct a special review of plaintiffs' concerns and instructed him that "[y]our overriding instruction … is to prepare a report that is accurate and correct from the standpoint of professional engineering analysis. If you agree with the concerns … you should say so and let the chips fall where they may." Erickson concluded that the Grade A joint was not inferior, the diametrical clearance was proper, using stop-off did not affect the joint's quality, X-ray inspection was not necessary, and any masking was not relevant. In a separate investigation, Tata agreed with Erickson's conclusions.

Based on these findings, the BCOC determined that plaintiffs' allegations were not credible and that they had acted unreasonably by refusing to work. The BCOC advised that Woodward would be justified in terminating them. On May 6, 2005, Marshall and Thurman met with Meichtry and Kirk Snyder, the leader of the group that produces the T2 sensor. Plaintiffs remained unwilling to work on the sensor, and Snyder terminated them—for the second time, according to plaintiffs.

Meanwhile, on April 26, Marshall and Thurman met with DOD Special Agent Daniel Boucek and expressed their concerns regarding the T2 sensor. Plaintiffs then met with Defense Contract Management Agency Technical Specialist Harrison DySard. DySard decided to review plaintiffs' concerns. Under the pretense of a general audit, DySard investigated Woodward's manufacturing process for the T2 sensor. He reviewed Woodward's operations, engineering drawings, and procedures and met with Woodward engineers. DySard

also consulted with his counterpart on-site at GE, Ed Craft. During DySard's investigation, Tata falsely stated to DySard that the Grade A joint was regularly inspected by X-ray.

In an email to Boucek, DySard concluded that there was "nothing either incorrect or wrong with the procedures, assembly, or testing of the sensors." He noted that "[t]he specific claim that the sensor was supposed to be x-rayed but hadn't was found to be false based on a review of the x-ray records for that part." Similarly, GE conducted its own investigation and also concluded that there was no cause for concern. The government continues to order, pay for, and use Woodward's T2 sensor.

On March 30, 2006, plaintiffs filed a complaint under seal in the Northern District of Illinois. The United States declined to intervene and the district court unsealed the complaint. Plaintiffs filed an amended complaint in March 2012. Following discovery, Woodward moved for summary judgment and on March 27, 2015, the district court granted Woodward's motion. Marshall and Thurman appeal.

## II. Discussion

We review a district court's grant of summary judgment de novo, examining the record in the light most favorable to the nonmoving party. *U.S. ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 494 (7th Cir. 2003). Summary judgment is appropriate if there is no genuine dispute of material fact and the nonmoving party is entitled to judgment as a matter of law. *Id.* (citing Fed. R. Civ. P. 56(c)).

The district court granted Woodward's motion for summary judgment on plaintiffs' claim that Woodward violated the FCA by making false statements to the government and

their claim that Woodward violated the FCA and Illinois law by terminating them. Plaintiffs renew both of these arguments on appeal.

**A. False Claims**

To state a claim under the FCA, plaintiffs must show that: (1) the defendant made a statement in order to receive money from the government; (2) the statement was false; (3) the defendant knew that the statement was false; and (4) the false statement was material to the government's decision to pay or approve the false claim. *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822, 828 (7th Cir. 2011).

The district court expressly assumed that Woodward made false statements to the government in its Certificates of Conformance. But the court concluded that the false statements were made without knowledge of their falsehood and were immaterial to the government's decision to pay. On appeal, plaintiffs challenge these two conclusions.

*1. Knowledge*

Under the FCA, a defendant must make a "knowingly" false statement. 31 U.S.C. § 3729(a)(1)(B). The FCA defines knowledge to include actual knowledge, deliberate ignorance, or reckless disregard for the truth; knowledge does not require specific intent to defraud. § 3729(b)(1). Accordingly, knowingly false statements do not include those that are the product of "[i]nnocent mistakes or negligence … ." *Yannacopoulos*, 652 F.3d at 823 (citation and internal quotation marks omitted).

First, plaintiffs argue that proof of Woodward's knowledge turns solely on whether Woodward knew its own quality requirements. They claim that it is undisputed

that Woodward knows its own quality requirements and thus, Woodward had the necessary knowledge for liability under the FCA. However, this analysis overlooks the focus of the knowledge inquiry: whether the false statements were made with the requisite state of mind. Even if Woodward was generally aware of its quality requirements, it lacked "knowledge" if the particular false statements were the result of a difference in interpretation or even negligence. *Id.*

Second, plaintiffs contend that Woodward did know that their statements to the government were false. They point to comments from Meichtry, Hollenberger, and Gorman as evidence that Woodward ignored quality concerns to meet its customers' demands. Plaintiffs claim that Woodward did not take their concerns seriously and that the internal investigations were insincere. But these stray remarks do not amount to knowledge of falsity. They do not demonstrate that anyone at Woodward believed that plaintiffs' concerns were valid. And the evidence shows that Woodward did takes plaintiffs' concerns seriously. Woodward thoroughly investigated plaintiffs' allegations on at least two separate occasions. Woodward's engineers concluded that the parts were fine and that the allegations were unfounded. Plaintiffs have not produced evidence to show that Woodward's investigations were unreliable.

In fact, everyone at Woodward, including the engineers who investigated plaintiffs' concerns, disagreed with plaintiffs. Meichtry and others in management deferred to Diedrich's investigation. Even Frutig, who initially agreed with Marshall, changed his mind based on the outcome of Diedrich's investigation. Plaintiffs do not point to any evidence that a decision-maker at Woodward agreed with their con-

cerns at the time Woodward made the statements to the government.

Plaintiffs maintain that Steve Krugler, a Woodward engineer, knew that the Grade A joint's inspection procedure violated Woodward's quality requirements. In 1997, Krugler removed the X-ray requirement for the Grade A joint. Plaintiffs allege that Krugler did not provide a compliant alternative to X-ray inspection and that he knew that this omission violated Woodward's quality requirements. However, Krugler did not testify to that effect. Krugler explained at the time that X-ray inspection was unnecessary, and he reiterated that belief during litigation. Instead, plaintiffs rely on testimony by their own experts, Roger Moseley and Jeff Diestelmeier, to suggest that Krugler knew that X-ray inspection or another alternative inspection was required. Specifically, Moseley testified that "when [Krugler] removed the x-ray inspection from this joint, he knew he had to do something else and didn't do it."

Testimony regarding the knowledge of another person based merely upon speculation is insufficient to demonstrate a genuine issue of material fact. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014) (explaining that a plaintiff must rely on more than "speculati[on] as to [a defendant's] state of mind, or other intuitions, hunches, or rumors" to defeat summary judgment). Moreover, Moseley's testimony relates to knowledge existing roughly fifteen years before the relevant time period. Hence, Moseley's testimony is insufficient to show that Krugler had knowledge that Woodward's certifications were false at the time that they were made. In sum, we agree with the district court that

no reasonable jury could impute knowledge of falsity to Woodward based on the evidence presented.

   2. *Materiality*

   Additionally, to prevail under the FCA, plaintiffs must show that the allegedly false statements were material to the government's decision to pay. The FCA defines material as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." § 3729(b)(4). We have described this as an objective standard. *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) ("The question is not remotely whether [the defendant] was sure to be caught … but whether the omission could have influenced the agency's decision. That's an objective standard … .").

   Plaintiffs make a circular argument that the materiality inquiry should focus on whether Woodward's certificates were capable of influencing the decision to pay. According to plaintiffs, because the government would not have paid Woodward without a certificate and Woodward would not have knowingly submitted a false certificate, a false statement on a certificate is necessarily material. We disagree. Following plaintiffs' logic, any false statement contained in a certificate, no matter how inconsequential, would be material. This would nullify the materiality requirement and make even "minor technical violations" material. *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999) ("Such minor technical violations … do not give rise to an FCA claim.").

   Furthermore, our case law focuses on whether the false statement itself, rather than the certificate or document con-

taining that statement, is capable of influencing the government's decision. *See, e.g.*, *Yannacopoulos*, 652 F.3d at 828 (focusing on whether defendant's "failure to check the proper box in the Certification Agreement was a material false statement"); *Rogan*, 517 F.3d at 452 (assessing whether the "statement or omission" itself is material). Hence, the appropriate inquiry is whether Woodward's allegedly false statements—that the Grade A joint meets its quality standards—are capable of influencing the government's decision.

With this in mind, we conclude that Woodward's false statements were immaterial. The government learned of plaintiffs' concerns, thoroughly investigated them, and determined that they were meritless. To this day, the government continues to pay for and use the T2 sensor. Therefore, the government's actual conduct suggests that the allegedly false statements were immaterial. GE also conducted an investigation into plaintiffs' allegations and reached the same conclusion as the government. In addition, Woodward has the right to change its shop procedures at any time without the government's permission. If specific quality standards are truly material to the government's decision to buy the sensor, it would be odd to give Woodward a unilateral right to change them.

Plaintiffs maintain that because materiality is an objective standard, the government's actual conduct is irrelevant. However, as the district court correctly found, plaintiffs misinterpret the materiality standard. Our prior case law establishes that the government's conduct is relevant to assessing materiality. *See, e.g.*, *Yannacopoulos*, 652 F.3d at 831 (considering that "the agency failed to take action when it actually learned of the supposed misrepresentation"); *U.S. ex rel. Lus-*

*by v. Rolls-Royce Corp.*, 570 F.3d 849, 855 (7th Cir. 2009) ("If the military services knew what they were getting and decided to accept blades that [plaintiff] deems 'inferior' rather than pay a higher price, then [defendant] will prevail on the merits."); *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732–33 (7th Cir. 1999) ("[Plaintiff] has not offered any evidence tending to show that the omission … was material to the United States' buying decision; the Department of Justice has conspicuously declined to adopt [plaintiff's] position or to prosecute this claim on its own behalf. As far as this record reveals, the federal government is 100% satisfied with the blood products … .").

Plaintiffs also challenge the reliability of the government's investigation. Accordingly, plaintiffs argue that the outcome of DySard's investigation and the government's continued decision to pay for and use the sensor should not be dispositive. They point to inadequacies in DySard's investigation, particularly that Tata falsely told DySard that Woodward regularly inspected the Grade A joint by X-ray. However, DySard testified in his deposition that he was not misled by Tata's statement. He stated that he knew that Woodward did not X-ray the Grade A joint as part of its regular inspection process. DySard also testified that Tata's false statement did not affect the outcome of his investigation. As a result, plaintiffs' attack on the government's investigation is unpersuasive. And even if the government was misled by Tata's false statement at the time, it has since been made aware of Woodward's actual practices yet continues to buy and use the sensor. Hence, we agree with the district court that Woodward's allegedly false statements were not material.

**B. Retaliation**

Finally, plaintiffs bring claims for retaliatory discharge under the FCA and Illinois state law. Plaintiffs allege that they were terminated because they raised concerns with the T2 sensor, which they argue is protected conduct under the FCA and Illinois law. The district court held that plaintiffs were terminated for insubordination and not for any protected conduct.

To pursue a retaliation claim under the FCA, employees must show that they were terminated because of their protected conduct. 31 U.S.C. § 3730(h); *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012). Similarly, under Illinois law, Marshall and Thurman must demonstrate that they were "(1) discharged; (2) in retaliation for [their] activities; and (3) that the discharge violates a clear mandate of public policy." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 628 (7th Cir. 2009) (quoting *Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009)). Although we have not squarely addressed this issue, the parties agree that under both the FCA and Illinois law plaintiffs must demonstrate "but for" causation. That is, plaintiffs must show that they would not have been terminated but for their protected conduct.

Plaintiffs maintain that they were terminated by Meichtry on April 18, an allegation we must accept on a motion for summary judgment. They also point to the fact that Marshall told Meichtry that she would disclose her concerns to the DOD prior to their termination. Accordingly, plaintiffs argue that Meichtry fired them in retaliation for Marshall's threat to disclose her concerns to the government.

But even reviewing the record in the light most favorable to plaintiffs, we agree with the district court that any reasonable jury would find that plaintiffs were terminated because of their insubordination, not protected activity. First, we agree with the district court that plaintiffs were in fact insubordinate. Plaintiffs contend that they were following their training to protect U.S. military personnel, and thus were not insubordinate. But their training did not authorize them to repeatedly refuse to resume working in the face of direct commands from multiple supervisors and an investigation dismissing their concerns.

Second, we also agree with the district court that plaintiffs' insubordination was the but for cause of their termination. Certainly, Woodward's management was irritated by plaintiffs' allegations. But Woodward terminated Marshall and Thurman only after investigating their concerns, informing plaintiffs that their concerns were unfounded, and giving plaintiffs multiple opportunities to resume their assigned tasks. Instead, plaintiffs engaged in insubordination by repeatedly refusing to work when faced with overwhelming evidence contradicting their allegations. The BCOC investigation, which determined that Woodward would be justified in terminating plaintiffs because of their insubordination, further bolsters the conclusion that plaintiffs were fired because of insubordination, not protected activity. Therefore, the district court correctly concluded that no reasonable jury could find that plaintiffs were terminated because of protected activity.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.